**BUSINESS FORMS FINISHING SERV-
ICE, INC., Plaintiff-Appellee,**

and

**Raymond P. Glowiak, Counterclaim
Defendant-Appellee,**

v.

**Palmer A. CARSON and Henry Kovach,
Defendants-Appellants.**

**No. 18525.**

United States Court of Appeals,
Seventh Circuit.

Oct. 15, 1971.

Francis T. Drumm, Chicago, Ill., for defendants-appellants.

Edward M. Keating, Chicago, Ill., for plaintiff-appellee.

Before DUFFY, Senior Circuit Judge, and STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

This is the second patent infringement suit that plaintiff has filed against defendants. The first, filed in 1965, was settled on January 10, 1968, when Judge Marovitz entered a consent order reciting that plaintiff's patent [1] was valid but not infringed. Defendants then started to market a somewhat different product, and on September 26, 1968, plaintiff commenced this action which was heard by Judge Napoli. He received no evidence on the issue of validity, holding that as between these parties the validity of the patent had been determined by the prior decree. Judge Napoli also rejected defendants' contention that lack of infringement could be established by proving that the second accused product, though admittedly not identical, was the "equivalent" of the first as a matter of law. After receiving evidence of infringement, on March 5, 1970, he entered judgment in favor of plaintiff and directed an accounting. Defendants have appealed from that judgment. Although subsequent proceedings are discussed in the briefs, they are not properly before us on this appeal.

Both parties rely on the consent decree as creating an estoppel which should control the disposition of this appeal. To explain why we think both are wrong, it will be necessary to discuss the issues of validity and infringement separately. We shall first briefly describe the patented product.

I.

The patent covers a product which makes it feasible to file numbered cards in a random order. The "random filing system" is useful because cards which had been removed temporarily can be refiled simply by placement at the rear of a file drawer without losing the ability to locate them as easily as if they had been filed in numerical order.

The system involves the use of colored tabs which can be affixed to the cards. Each tab is preprinted with a two-digit number, and each decade of tabs uses a different color or design. [2] The tab col-

---

1. United States Patent No. 3,191,767 entitled "Index Tab Card Converters," issued to Raymond P. Glowiak on June 29, 1965, and subsequently assigned to the plaintiff corporation.

2. Thus, in a set of 100 tabs, ten colors are used. More precisely, there are five colors, each color being used either in its solid form or with a tab which is half white and half colored.

or, the position of the tab,[3] and the digits all contribute to the ready identification of the last two digits of the number on the file card.[4]

The theory of the system is that it is easier to inspect each card ending with the desired two digits than it is to locate a specific number in a large file drawer; or at least to the extent that time may be lost while inspecting each card with a particular kind of tab, the loss will be more than offset by the time saved when the cards are simply refiled at the back of a drawer in a bunch without the necessity of individual replacement.

3. A tab is affixed to a card in a position determined by the last digit, with a higher number digit being placed farther to the right than a lower.

4. As an illustration, numbers 60 through 69 in plaintiff's "Tab Master Kit" are all solid green; tab number 60 will be affixed at the far left position at the top of a card having a number ending in "60" (e. g., 1260, 2560, or any other number ending in 60). If the last two digits in the card number should be 69, the green tab bearing that number will be affixed at the far right of the top of the card.

5. The claim itself, however, makes no reference to colors or numbers; it reads: "I. A tab forming card, said tab forming card including backer sheet means, and an elongated tab sheet means, said tab sheet means having a plurality of discrete tab forming areas formed therein inwardly of the longer side edges thereof, said backer sheet means and tab sheet means being separately secured to one another by adhesive means, each of said tab forming areas being peripherally continuous, said backer sheet means being imperforate over at least those areas underlying the peripheries of the separable tab forming areas, each of said separable, peripherally continuous tab forming areas being removable from the backer sheet means, and being bounded by a closed cut line, each of said separable tab areas having a first, transparent portion adapted to be secured to an edge of a receiving structure, and a second, relatively opaque portion capable of presenting identifying indicia."

Plaintiff's patent does not cover the random filing system. It covers a product. Claim 1 covers a "tab forming card" which, for example, may be a strip containing ten tabs of a given color numbered in sequence from 60 to 69.[5] Claim 8 covers a "conversion unit" which apparently would include ten sets of strips, each set being of a different color and with a different decade of numbers.[6] As we understand the claims, the individual tab, which is removed from a strip and applied to a numbered card, is not itself covered by claim 1 or claim 8.[7]

6. Thus, the green tabs numbered 60 to 69 would be in one set of strips, the blue tabs from 70 to 79 in another. and so on.

7. Claim 8 partially describes the random filing system; it reads:
8. A conversion unit for converting a card system wherein the system information is cataloged on a number basis to a key number and position system, said unit including, in combination: a plurality of card converters, each card converter including a backer sheet and a tab sheet, said sheets being separably secured one to another by a layer of pressure sensitive adhesive, said tab sheet having a multiplicity of separable tab areas, each of said tab areas being separately removable with its adhesive from the backer sheet and the surrounding portions of the tab sheet, said separable tab areas each having a lower transparent portion adapted to be secured by the adhesive it carries to an upper edge of a card and an indicia receiving surface overlying the transparent portion, the indicia receiving surfaces on all tab areas on each converter being of a like color arrangement, each card converter being of a different color and each carrying a different series of consecutive numbers, one number on each tab area, said series being consecutive from card converter to card converter, the number of tab areas on each card converter being equal to a series of numbers in which the last digit appears only once, the location of each of two tab areas ending in the same digit in each of

The product is sold by plaintiff in a kit. Each kit contains ten sets of ten strips, a position indicator, and simple instructions which explain the random filing system. The kit is especially useful for a small loan company employing large numbers of loan cards.

Defendants' products are also expressly designed for use in the random filing system. The product challenged in the first suit was not sold in strips of ten tabs, but rather in sheets, each of which contained fifty tabs arranged in five rows. Defendants did not start to market tabs in strips of ten until after the first case was settled. It is the strip form of defendants' product which Judge Napoli found to be infringing in this case.

## II.

In order to settle the first litigation, defendants unambiguously agreed to recognize the validity of plaintiff's patent.[8] In this litigation defendants are in the unattractive position of seeking to repudiate their solemn undertaking while the ink is barely dry.[9] Understandably, es-

pecially since the agreement had been incorporated into a judicial decree, Judge Napoli held that as between the parties the matter of validity had been finally decided.[10] In reviewing that holding, it is quite clear that questions of business ethics must be put to one side. *Cf.* Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L. Ed.2d 661. We must decide whether, as a matter of contract, the defendants should be held to their bargain, and if not, whether the judicial decree is nevertheless binding.

### A.

■ An undertaking not to challenge the validity of a patent is, in effect, a covenant not to manufacture or sell the patented commodity without the consent of the patentee. It is, therefore, not surprising to find the same competing policy considerations reflected in common law cases dealing with the enforceability of covenants not to compete[11] and in Supreme Court decisions limiting and ultimately repudiating the doctrine of licensee estoppel.[12] Although the lines of

---

any two card converters being in the same relative position with respect to the first tab area in its associated series from card converter to card converter.

8. Paragraph 2 of the consent order entered by Judge Marovitz on January 10, 1968, read as follows:
"2. That as to Defendants-Counterclaim Plaintiffs and those who are now or hereafter may be in privy with them, or controlled by them, U. S. Patent No. 3,191,767 is valid."

9. Although the state of the record before us is somewhat confused, it is clear that defendants tried to challenge the validity of the patent in this proceeding. At page 6 of its brief, plaintiff-appellee states:
"Carson, both before the trial court and in his brief here, has spent considerable time and energy attacking the validity of Business Forms' U. S. Patent No. 3,191,767."

10. One of the conclusions of law provided:
"2. As between the parties, the Glowiak patent claims are valid having been so adjudicated by the judgment in the prior litigation between the parties."

11. *Compare* Mitchel v. Reynolds, 24 Eng. Rep. 347 (K.B. 1711) with the Dyer's Case, Y.B. 2 Hen. V., vol. 5, pl. 26 (1415). Lord Macmillan, speaking for the privy counsel in Vancouver Malt & Sake Brewing Co., Ltd. v. Vancouver Breweries, Ltd., [1934] A.C. 181, 189, stated the policy considerations as follows:
"Public policy is not a constant. More especially is this so where the doctrine represents a compromise between the principles of public policy; in this instance, between, on the one hand, the principle that persons of full age who enter into a contract should be held to their bond and, on the other hand, the principle that every person should have unfettered liberty to exercise his powers and capacities for his own and the community's benefit."
The court went on to hold that the agreement there involved was unenforceable as a bare covenant against competition, and also because it was unlimited in area. See also cases cited *infra*, note 14.

12. See Lear, Inc. v. Adkins, 395 U.S. 653, 663–667, 89 S.Ct. 1902, 23 L.Ed.2d 610. At 668, 89 S.Ct. at 1910, the Court identified the competing policies:

authority have wavered from time to time, there has been consistent recognition of the fact that the private dispute has ramifications that may affect the public interest in free competition and in the free circulation of ideas. For that reason enforceability cannot be determined without reference to matters beyond the private interests of the litigants.[13]

Under the common law authorities, because of the public interests which are affected, the covenantee has the burden of justifying the restraint on competition. Some covenants, such as those unlimited in time or scope, are flatly condemned; others, if limited and ancillary to a valid business purpose, may be justified as reasonable.[14] Presumably a private agreement between competitors to refrain from challenging a patent may be justified in certain situations, but it seems clear that the burden of justification must rest on the covenantee. As we read the recent decisions of the Supreme Court, which are strikingly unanimous in result as well as reasoning, the desirability of settling a lawsuit would not in itself establish sufficient justification for such an agreement.

In its recent decision in Blonder-Tongue v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L. Ed.2d 788, the Court relied heavily on the public interest in encouraging tests of patent validity. In the course of its analysis of the relevant economic considerations, the Court stated:

"The tendency of *Triplett* [Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed.2d 649] to multiply the opportunities for holders of invalid patents to exact licensing agreements or other settlements from alleged infringers must be considered in the context of other decisions of this Court. Although recognizing the patent system's desirable stimulus to invention, we have also viewed the patent as a monopoly which, although sanctioned by law, has the economic consequences attending other monopolies. A patent yielding returns for a device that fails to meet the congressionally imposed criteria of patentability is anomalous.

\*　　\*　　\*　　\*　　\*　　\*

"A second group of authorities encourage authoritative testing of patent validity. In 1952, the Court indicated that a manufacturer of a device need not await the filing of an infringement action in order to test the validity of a competitor's patent, but may institute his own suit under the Declaratory Judgment Act. Kerotest Mfg. Co. v. C–O–Two Co., 342 U.S. [180], at 185–186 [72 S.Ct. 219, at 222, 96 L.Ed. 200]. Other decisions of this type involved removal of restrictions on those who would challenge the validity of patents.

"Two Terms ago in Lear, Inc. v. Adkins, 395 U.S. 653 [89 S.Ct. 1902]

"The uncertain status of licensee estoppel in the case law is a product of judicial efforts to accommodate the competing demands of the common law of contracts and the federal law of patents. On the one hand, the law of contracts forbids a purchaser to repudiate his promises simply because he later becomes dissatisfied with the bargain he has made. On the other hand, federal law requires, that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent."

13. "It must be remembered that the public is a silent but an important and interested party in all patent litigation, and is entitled to protection against the monopo-

lization of what is not lawfully patentable." Rota-Carb Corp. v. Frye Mfg. Co., 313 F.2d 443, 444 (8th Cir. 1963).

14. For example, a covenant of state-wide scope was held invalid in Parish v. Schwartz, 344 Ill. 563, 176 N.E. 757 (1931). The common law authorities on ancillary restraints are extensively reviewed by Judge Taft in United States v. Addyston Pipe and Steel Co., 85 F. 271 (6th Cir. 1898). See also Vancouver Malt & Sake Brewing Company, Ltd. v. Vancouver Breweries, Ltd. [1934] A.C. 181; Shapard v. Lesser, 193 S.W. 262 (Ark. 1917); Clark v. Needham, 125 Mich. 84, 83 N.W. 1027 (1900); Milgram v. Milgram, 105 Ind.App. 57, 12 N.E.2d 394 (Ind.1938).

(1969), we relied on both lines of authority to abrogate the doctrine that in a contract action for unpaid patent royalties the licensee of a patent is estopped from proving 'that his licensor was demanding royalties for the use of an idea which was in reality a part of the public domain.' 395 U.S., at 656 [89 S.Ct. at 1904]. The principle that 'federal law requires, that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent,' 395 U.S., at 668 [89 S.Ct. at 1910], found support in *Sears* and *Compco* and the first line of cases discussed above. The holding that licensee estoppel was no longer tenable was rooted in the second line of cases eliminating obstacles to suit by those disposed to challenge the validity of a patent. 395 U. S., at 663–668 [89 S.Ct. at 1907–1910]. Moreover, as indicated earlier, we relied on practical considerations that patent licensees 'may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery.' 395 U. S. at 670 [89 S.Ct., at 1911]." 402 U.S. at 342–343, 344–345, 91 S.Ct. at 1450–1451.

We believe that the policy considerations which underlie *Blonder-Tongue, Lear, Sears* and *Compco* [15] lead inescapably to the conclusion that the defendants' agreement to accept the validity of plaintiff's patent is unenforceable. We so hold.

### B.

■ Plaintiff's estoppel argument rests on more than a private agreement between the parties. In addition, plaintiff claims the benefit of an adjudication because the determination of validity was included in a judicial decree entered after three days of trial in which a genuine issue of validity had been raised.

Although the first case was partially tried, it does not appear that Judge Marovitz actually decided the issue of validity.[16] Moreover, since the decree recited that the accused products did not infringe, there was no necessity for a determination of validity. In these circumstances, as the Second Circuit has held, a consent decree does not create an estoppel on the issue of validity. Addressograph Multigraph Corp. v. Cooper, 156 F.2d 483 (2nd Cir. 1946). A contrary result could not be reconciled with "the public interest in a judicial determination of the invalidity of a worthless patent." *Id.* at 485.

We have, therefore, concluded that the judgment of the district court must be vacated and the case remanded for such further proceedings as may be necessary to adjudicate the validity of claims 1 and 8 of plaintiff's patent.

### III.

■ There are two aspects to the infringement issue. Defendants contend that the prior decree settled their right to sell the accused product. This contention cannot withstand a fair reading of the consent decree and the colloquy with Judge Marovitz at the time of its entry. Nevertheless, because of the possibility that a decision sustaining validity may depend on a construction of the claims that is sufficiently narrow to avoid infringement, *cf.* Marcalus Mfg. Co. v. Automatic Paper Mach. Co., 110 F.2d 304, 306 (3rd Cir. 1940); Fredman v. Harris-Hub Co., 442 F.2d 210 (7th Cir. 1971), we vacate the finding of infringement to enable the district court to make a fresh analysis of that issue in the light of whatever ruling is ultimately made with respect to validity.

### A.

■ Defendants argue, as a matter of patent law, that their product in strip form is the "equivalent" of the product

---

15. Compco Corp. v. Day-Brite Lighting, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669.

16. The case was settled before plaintiff had rested and apparently before plaintiff's expert had testified.

in sheet form and, therefore, that they are entitled to the benefit of the finding of noninfringement in the prior case. Without expressly so arguing, they are necessarily contending that the finding should be construed to cover not only the specific products accused in the first case, but also certain other products as well. We think the language of the decree forecloses this argument. The matter of infringement was covered by the following provision in the consent order entered by Judge Marovitz:

> "3. Plaintiff-Counterclaim Defendant, Business Forms Finishing Service, Inc., and Counterclaim Defendant, Raymond P. Glowiak, agree that Pre-Trial Stipulation Exhibits A and B, two sheets of said products being attached hereto, do not infringe Patent 3,191,767. Samples of the Plaintiff-Counterclaim Defendant's patented product are attached hereto and identified as copies of plaintiff's exhibits 26A, 27A and 28a."

At the time the decree was presented for entry, counsel for defendants suggested that defendants should be entitled to a reasonable range of equivalence and specifically indicated that they considered producing their product in strips rather than sheets.[17] Thereafter the court expressly explained that the settlement covered only the product in the form of the exhibits offered at the trial, and directed that a copy of the exhibit that was claimed to infringe should be attached to the consent decree. He then stated, "[I]f they do something differently, if they do something beyond this, then you may have a lawsuit."[18] Quite clearly neither the plaintiff nor the court intended the settlement to determine the question of infringement which might be presented by defendants' marketing of their product in strip form. Accordingly, in this proceeding Judge Napoli properly decided that the issue of infringement should be appraised *de novo*.

### B.

The infringement findings are predicated on expert testimony and exhibits explaining how the language used in the claims describes elements in the accused products. We do not find, however, that the expert explained the inventive concept embodied in the patent. Under the ruling that defendants were estopped to question validity, analysis of the prior art and of the inventor's specific contribution to the art was deemed unnecessary. Since such an analysis must now be made, it will also be necessary to make a fresh study of the infringement issue.

■ A determination of the infringement issue requires more than consideration of the phraseology of the claims. An understanding of the inventive concept is also essential. This point has been well expressed in a series of opinions which Judge Duffy has written for this court. We need quote from only one:

> "In Independent Pneumatic Tool Co. v. Chicago Pneumatic Tool Co., 7 Cir., 194 F.2d 945, we said at page 947: 'Of course, in determining whether an accused device infringes a valid patent, resort must be had in the first instance to the words of the claim, but as we said in Flowers v. Austin-Western Co., 7 Cir., 149 F.2d 955, 958, *mere application of claim phraseology is not alone enough to establish infringement*, nor is similarity of result. There must be real identity of means, operation and result.'

---

17. "MR. DRUMM: The defendants are entitled to a reasonable range of equivalence which is *substantially the same structure.* For instance, the defendants would be entitled to make their product such as you see right there, in strip form rather than in sheet form." Tr. pp. 6–7. (Jan. 8, 1968)

18. Tr. p. 10 (Jan. 8, 1968).

"In North Star Ice Equipment Company v. Akshun Manufacturing Company, 7 Cir., 301 F.2d 882, this Court said at page 886: 'The mere fact that the same end result is accomplished, is not sufficient to be the basis of a finding of infringement. * * *' *The test of infringement must be the use by defendant of the inventive features of the patent in suit.* Dixie-Vortex Co. v. Paper Container Mfg. Co., 7 Cir., 130 F.2d 569, 579." Elgen Manufacturing Corp. v. Ventfabrics, Inc., 314 F.2d 440, 443–444 (7th Cir. 1963). (Emphasis added.)

In an earlier case, which in a sense presaged the holding in Lear, Inc. v. Adkins, *supra*, this court held that even though the defendant was estopped to deny validity, the mere fact that his device "reads upon" the claims of the patent is insufficient to spell infringement. Casco Products Corporation v. Sinko Tool & Mfg. Co., 116 F.2d 119, 121 (7th Cir. 1940).[19] Judge Lindley described our obligation as encompassing an examination of the prior art not only to determine the scope of plaintiff's invention, but also to determine whether the defendant's product is derived from concepts in the public domain. After acknowledging the rule which then estopped the defendant from challenging validity, he continued:

"* * * but that, by the same token, defendant is not estopped to prove that its devices are built wholly according to the teaching of the prior art and that everything necessary to their conception and construction was taught by such art, for such proof clearly negatives infringement. In other words if everything in defendant's construction was taught by the prior art and nothing included therein other than the application of such art, plus ordinary mechanical skill, then *the mere fact that the device constructed reads upon the claims of patents, the validity of which it is estopped to deny, does not spell infringement.* Our conception of our obligation, therefore, is that we must examine the prior art not only to determine the scope of plaintiff's invention but also to determine whether what is built by defendant springs entirely therefrom." 116 F.2d at 121. (Emphasis added.)[20]

In this case the evidence offered by plaintiff sheds little, if any, light on the inventive concept of the patent. The random filing system is admittedly not covered. We do not know whether the obvious similarity between defendants' colorful tabs and plaintiff's has any relevance to the original ideas that led to the issuance of the patent because plaintiff was successful in persuading the district court to ignore the prior art and to confine his analysis to the language of the claims. This approach to the infringement issue was too restrictive.

IV.

Defendants have advanced a number of additional contentions which do not merit extended discussion. Some involve matters which are not before us;[21] others are clearly without merit.[22]

19. The Casco opinion is cited by the Supreme Court in Lear, Inc. v. Adkins, 395 U.S. at 665, 89 S.Ct. 1902.

20. See also Rex Chainbelt, Inc. v. General Kinematics Corp., 363 F.2d 336, 348 (7th Cir. 1966); Ellipse Corp. v. Ford Motor Co. (7th Cir. 1971), 452 F.2d 163.

21. Thus, for example, defendants attack rulings by the Master who conducted an accounting after the appeal had been taken.

22. Thus, for example, defendants assert that the antitrust laws are violated by the commencement of an action charging infringement of a patent that plaintiff knows to be invalid. Neither the allegations in the counterclaim nor any evidence adduced or offered on behalf of the defendants identifies the elements of an antitrust violation.

Defendants have also argued that they were deprived of their constitutional right to a fair trial because the district judge was biased and prejudiced. On this contention we shall comment.

Neither adverse rulings, however numerous, nor error can justify the serious charge that a district judge is biased and prejudiced. We thoroughly respect and will protect a lawyer's right to identify judicial misconduct, but we also have an obligation to identify serious misconduct at the bar when it is called to our attention.[23] Although we have concluded that error was committed, we have nothing but praise for Judge Napoli's evenhanded conduct of the trial. His rulings were clear, reasonable and consistent. He received little help from defendants' counsel in the form of citation to pertinent authority. He was confronted with repeated and inexcusable dilatory conduct by defendants' counsel. He nevertheless exhibited the utmost courtesy and patience in his attempts to assist counsel in preserving his record, repeatedly, for example, advising him of the need for an offer of proof. Defendants' contention of bias of the trial judge is wholly without merit.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

---

**23.** Canon 2 B of the proposed Canons of Judicial Ethics recommended by the American Bar Association Special Committee on Standards of Judicial Conduct (May, 1971—tentative draft) provides, in part, that a Judge should: "Correct or report to an appropriate disciplinary body serious misconduct by lawyers of which he may become aware; * * *."

While the improper conduct in this case is not such as to warrant referral to a disciplinary body, we think that the same professional and ethical considerations which require referral of a serious misconduct case to a disciplinary body also require that the court comment upon less serious, but nonetheless significant, cases of improper conduct.

In addition to the unfounded charges of bias, we note that defendants' counsel, both in his reply brief and in oral argument, admitted that he advised his clients to disobey Judge Napoli's March 5, 1970, order on the grounds that the injunction was too indefinite. Although we do not have sufficient information before us on which to determine the issue, it would appear that an appeal raising the indefiniteness issue, not advice to disregard a court order, would have been the appropriate action for a lawyer to take. We note that the ABA Code of Professional Responsibility, § DR 7–106(A), provides: "A lawyer shall not disregard or advise his client to disregard a standing rule of a tribunal or ruling of a tribunal made in the course of a proceeding, but he may take appropriate steps in good faith to test the validity of such rule or ruling."