**WALLACE CLARK & COMPANY, INC., Plaintiff,**

v.

**ACHESON INDUSTRIES, INC., Defendant.**

No. 74 Civ. 2812.

United States District Court,
S. D. New York.

April 28, 1975.

Sandoe, Hopgood & Calimafde, New York City, for plaintiff; Paul H. Blaustein, New York City, of counsel.

Pennie & Edmonds, New York City, for defendant; James G. Foley, New York City, Harness, Dickey & Pierce, Michael Dinnin, Jr., Birmingham, Mich., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is the second action instituted in this court by plaintiff, Wallace Clark & Company, Inc. ("Wallace Clark"), against the defendant, Acheson Industries, Inc. ("Acheson"), involving the validity and infringement of patent No. 2,976,257 issued to and owned by Acheson. The first action was instituted by plaintiff in December 1971 for a declaratory judgment of invalidity of defendant's patent and its non-infringement by plaintiff's manufacture, use and sale of its product Meta-Tef 530. Acheson counterclaimed, charging plaintiff with patent infringement. After pretrial discovery procedures the case moved forward to trial; however, it was never tried. The parties entered into a consent decree wherein Acheson's patent was held both valid and infringed by plaintiff's product Meta-Tef 530. Coincidental thereto, the parties executed a non-exclusive licensing agreement under which Wallace Clark is licensed to manufacture and sell certain products under the claims of Acheson's patent with royalty payments determined on a percentage basis with a fixed minimum. The license is coterminous with the patent; both expire on March 21, 1978. Pursuant to the agreement, the consent decree was submitted to and duly signed on October 6, 1972 by Judge Cannella, to whom the matter had been assigned. The decree provided for the dismissal of the action with each party to bear its own costs and attorneys' fees.

Plaintiff made the payments required under the license agreement until

January 1, 1974, when it discontinued making further payments. Thereupon, in April 1974, Acheson filed an action in Michigan state court against Wallace Clark for breach of the licensing agreement. Wallace Clark counterclaimed for a declaratory judgment that it had the right to contest validity of the Acheson patent and also to allege invalidity and non-infringement as a defense to Acheson's suit to recover royalty payments; it also asserted as a defense patent misuse, claiming that the minimum royalty clause is an illegal extension of the patent. In addition, Wallace Clark counterclaimed for treble damages under section 1 of the Sherman Act [1] based upon the provision in the license agreement that it may not be terminated during the life of the patent. Within two months thereafter, in June 1974, Wallace Clark instituted this action, the second in this court, for a declaratory judgment asserting substantially the same claims advanced as defenses and counterclaims in the Michigan action. [2]

Wallace Clark now moves to be relieved of the terms of the consent decree under Rule 60(b)(5) of the Federal Rules of Civil Procedure on the ground that "it is no longer equitable that the judgment should have prospective application," and under Rule 60(b)(6) for "other reason[s] justifying relief from the operation of the judgment." While it seeks relief under the foregoing rule, actually its motion is for summary judgment to determine the res judicata effect of the consent decree considered in light of the Supreme Court's ruling in Lear, Inc. v. Adkins. [3] Wallace Clark's request for relief is miscast under Rule 60(b)(5) or (6) since it entered into the consent decree three years *after* the Supreme Court's decision in *Lear* on June 16, 1969. Presumably the parties to the lawsuit, represented by the same experienced patent attorneys who now appear on their behalf, were not unfamiliar with its holding. [4] Acheson agrees the issue is one of law and that the matter is ripe for disposition. Accordingly, we turn to the mer-

---

1. 15 U.S.C. § 1.

2. Acheson moved to stay this action pending determination of its suit in the Michigan state court. Wallace Clark moved to stay the Michigan state court action pending a determination of this action. While the instant motion was sub judice, the Michigan state court rendered a decision upholding Wallace Clark's position that the consent decree is not entitled to res judicata effect, but it did so because of paragraph 3 of the decree referred to below. Leave to appeal was granted. Notwithstanding the ruling in that case, both parties stipulated to dismiss the Michigan action and to proceed in this court for determination of the issue.

The provision of paragraph 3 of the consent decree that "[t]his decree may not be cited as an adjudication of contested issues, nor be used for advertising purposes," is regularly included in patent consent decrees in this district, and this court has always required its inclusion. The provision was never intended to deprive consent decrees of their res judicata effect and plaintiff makes no such claim in this court. The clause was designed to prevent misuse of consent decrees with respect to third parties by representations, whether explicit or implicit, that

the judgment was entered after a trial on the merits. *See* PCR Golf Ball Co. v. Chemold Corp., 361 F.Supp. 187 (E.D.N.Y. 1973). The same precautionary provision is included in copyright cases.

3. 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

4. Rule 60(b)(5) contemplates relief from a judgment as a result of a *later* change in the law such as when a statute is amended or when a prior judgment is reversed or modified. *See, e. g.,* Class v. Norton, 507 F.2d 1058, 1061–62 (2d Cir. 1974). Moreover, relief from a judgment on the latter grounds is restricted to situations where the present judgment is based on the prior judgment in the sense of res judicata or collateral estoppel. Rule 60(b)(5) does not apply where a case relied on as precedent by the court in rendering the present judgment has since been reversed. Title v. United States, 263 F.2d 28, 31 (9th Cir.), cert. denied, 359 U.S. 989, 79 S.Ct. 1118, 3 L.Ed.2d 978 (1959); Berryhill v. United States, 199 F.2d 217, 219 (6th Cir. 1952); Loucke v. United States, 21 F.R.D. 305 (S.D.N.Y.1957). *See* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2863 (1973).

its of plaintiff's claim for relief under the summary judgment rule.[5]

## I

## A.

■ Plaintiff, in reliance upon *Lear*, seeks to avoid any res judicata effect of the consent decree. Under the general rule that a consent judgment has res judicata effect,[6] plaintiff would be estopped from contesting the validity of Acheson's patent and that its Meta-Tef 530 product infringes thereon. However, Wallace Clark contends that the decree should not be accorded res judicata effect in light of the public policy against invalid patent monopolies. Thus, the issue to be determined is the res judicata effect of the consent decree in subsequent litigation between the same parties presenting the same issues of validity and infringement as in the prior action.

## B.

Since plaintiff's principal reliance in support of its position is on *Lear*, it is desirable to consider the facts upon which *Lear* was grounded, its precise holding and its underlying rationale.

Adkins, an inventor, was hired by Lear, Inc. in January 1952 to help solve gyroscope problems encountered by Lear in its work in the aviation field. They entered into a preliminary agreement which provided that all new ideas, discoveries and inventions related to vertical gyros became the property of Adkins; in turn, he agreed to grant Lear a license as to all ideas he developed on a mutually satisfactory royalty basis. Adkins soon developed an improved gyroscope which Lear incorporated into its production process. In February 1954, Adkins filed an application with the Patent Office to protect his improvements, and at about the same time entered into negotiations with Lear for licensing and royalty arrangements. These negotiations were concluded in September 1955 in an agreement which defined the conditions under which Lear California gyros used his patent and that claiming that both the Michigan and was obligated to pay royalties for Adkins' improvements. This agreement provided that if the Patent Office refused to grant a patent on Adkins' pending application, or if a patent were issued and latter declared invalid, Lear had the option to terminate the specific license so affected or to terminate the entire agreement.

Adkins' patent application was not granted until 1960, only after he had narrowed the scope of his claims following rejection of his original broad claim that his entire method of constructing gyroscopes was entitled to a patent monopoly. From the filing by Adkins of his original application in 1954 to the grant of his patent in 1960, Lear questioned that Adkins was entitled to receive a patent. In 1957, after Adkins' patent applications had been rejected twice, Lear contended that a Patent Office search disclosed a prior patent which had fully antedated Adkins' discovery. Lear then refused to pay royalties any longer on gyroscopes produced at its Michigan plant, which it claimed it had developed independently, although it continued to pay royalties on those produced at its California plant until 1959.

---

5. Fed.R.Civ.P. 56.

6. United States v. Southern Ute Indians, 402 U.S. 159, 91 S.Ct. 1336, 28 L.Ed.2d 695 (1971) ; Siegel v. National Periodical Publications, 508 F.2d 909, 913 (2d Cir. 1974) ; Siebring v. Hansen, 346 F.2d 474, 477 (8th Cir.), cert. denied, 382 U.S. 943, 86 S.Ct. 400, 15 L.Ed.2d 352 (1965) ; Kiwi Coders Corp. v. Arco Tool & Die Works, 250 F.2d 562, 568 (7th Cir. 1957) ; Folgueras v. Hassle, 331 F.Supp. 615, 616 (W.D.Mich.1971) ; Stuyvesant Ins. Co. v. Dean Const. Co., 254 F.Supp. 102, 110 (S.D.N.Y.1966), aff'd sub nom. Stuyvesant Co. v. Kelly, 382 F.2d 911 (2d Cir. 1967) ; Moore's Federal Practice ¶ 0.409[5]. *See* United States v. Swift & Co., 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L. Ed. 999 (1932) : "We reject the argument . . . that a decree entered upon consent is to be treated as a contract and not as a judicial act."

When Adkins obtained his patent in 1960, he brought suit against Lear Lear's failure to pay royalties on those gyros was a breach both of the 1955 contract and Lear's quasi-contractual obligation. Lear sought to raise patent invalidity as a defense, but the trial judge directed a verdict in favor of Adkins on the California gyros, holding that Lear was estopped by the licensing agreement from questioning Adkins' patent. Following an intermediate appeal, the case reached the California Supreme Court, which held that

> "[o]ne of the oldest doctrines in the field of patent law establishes that so long as a licensee is operating under a license agreement he is estopped to deny the validity of his licensor's patent in a suit for royalties under the agreement. The theory underlying this doctrine is that a licensee should not be permitted to enjoy the benefit afforded by the agreement while simultaneously urging that the patent which forms the basis of the agreement is void." [7]

The court found that the 1955 agreement between Adkins and Lear was in effect and concluded that under the doctrine of licensee estoppel, Lear was barred from challenging the validity of Adkins' patent.

The Supreme Court recognized that when it last considered the doctrine in Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,[8] it, like the California Supreme Court, had invoked estoppel to deny a licensee the right to prove that his licensor was demanding royalties for the use of an idea which was not validly patented and thus a part of the public domain. Certiorari was granted "to reconsider the validity of the Hazeltine rule in the light of . . . recent decisions emphasizing the strong federal policy favoring free competition in ideas which do not merit patent protection." [9]

In considering this issue, Mr. Justice Harlan reviewed in detail the Supreme Court, intermediate federal and state court cases which had carved out various exceptions to the "general rule" of licensee estoppel, and observed that the exceptions had all but eroded the estoppel doctrine in patent licensing agreements. Thus, he concluded:

> "The uncertain status of licensee estoppel in the case law is a product of judicial efforts to accommodate the competing demands of the common law of contracts and the federal law of patents. On the one hand, the law of contracts forbids a purchaser to repudiate his promises simply because he later becomes dissatisfied with the bargain he has made. On the other hand, federal law requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent. [citations omitted] When faced with this basic conflict in policy, both this Court and courts throughout the land have naturally sought to develop an intermediate position which somehow would remain responsive to the radically different concerns of the two different worlds of contract and patent. The result has been a failure. Rather than creative compromise, there has been a chaos of conflicting case law, proceeding on inconsistent premises." [10]

He thereupon "renew[ed] the search for an acceptable middle ground." [11]

7. Adkins v. Lear, Inc., 67 Cal.2d 882, 891, 64 Cal.Rptr. 545, 549, 435 P.2d 321, 325–26 (1967).

8. 339 U.S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312 (1950).

9. 395 U.S. at 656, 89 S.Ct. at 1904, *citing* Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

10. 395 U.S. at 668, 89 S.Ct. at 1910.

11. *Id.*

In searching for this accommodation, the Court reasoned that a patent is a legal conclusion reached by the Patent Office about which reasonable men could differ widely, a conclusion often reached in an ex parte proceeding. In this circumstance the Court considered it not unfair to require a patentee to defend the Patent Office's judgment when his licensee raises the issue of validity, particularly since the licensor has the benefit of the presumption of validity which attaches to his patent.[12] Licensees are usually the only individuals possessed with sufficient economic incentive to challenge the patentability of an inventor's discovery, and "[i]f they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification." [13] In ultimate terms the Court concluded that "the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain" required that "the technical requirements of contract doctrine must give way before the demands of the public interest." [14] Accordingly, the general licensee estoppel doctrine enunciated in Automatic Radio Manufacturing Co. v. Hazeltine Research Inc. was overruled and put to rest.[15]

### C.

This extended recital points up at once essential differences between the facts in *Lear* and those in the instant case. Lear, from the time it acquired its licensing rights prior to grant of the patent, had challenged Adkins' right to the patent monopoly. And after the grant of the patent, Lear was never permitted by the California courts to challenge the validity of the patent because of the doctrine of licensee estoppel. In *Lear* there was no litigation leading to a consent decree. Here a consent decree and license agreement were entered into only after the issuance of the patent and after Wallace Clark commenced its first declaratory judgment action. This was after pretrial discovery and with a full opportunity to have the contested issues of validity and infringement judicially determined.[16]

Wallace Clark's present attempt to disavow its commitment under the decree rests upon the rationale that if it, as a licensee, is now foreclosed from challenging the validity of the patent, the public would be forced to pay tribute to an unwarranted monopoly grant. Accordingly, plaintiff presses that the public interest as explicated in *Lear* is so predominant that its own prior conduct in voluntarily entering into the consent decree is irrelevant and that it should not be estopped from challenging the validity of plaintiff's patent—in short, that the "public interest in a judicial determination of the invalidity of a worthless patent" [17] not only outweighs principles of contract law, but also the public policy favoring the finality of litigation and the conservation of judicial resources. It may be in order to observe, however, as Judge Friendly did in another context, that public policy "is a very unruly horse, and when once you get astride it, you never know where it will carry you." [18]

12. 35 U.S.C. § 282.

13. 395 U.S. at 670, 89 S.Ct. at 911.

14. *Id.*

15. *Id.* at 671, 89 S.Ct. at 1911.

16. "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." United States v. Armour & Co., 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).

17. Addressograph-Multigraph Corp. v. Cooper, 156 F.2d 483, 485 (2d Cir. 1946).

18. Painton & Co. v. Bourns, Inc., 442 F.2d 216, 225 (2d Cir. 1971), *quoting* Richardson v. Mellish, 2 Bing. 229, 252 (1824).

■■■ We start with the observation that the public interest is dominant in the patent system; consequently, to protect the public interest in the free circulation of ideas, the doctrine of res judicata in patent cases has been limited to assure that invalid patents are not used or valid patents misused to acquire a monopoly power.[19] Thus, long before *Lear*, this circuit held in *Addressograph-Multigraph Corp. v. Cooper*[20] that a consent decree in a prior suit by the same parties which merely decreed that a patent was valid did not estop a party from later contesting validity in another suit for infringement brought by the same plaintiff. But where there was an adjudication of infringement, the decree would be given res judicata effect. The holding in *Addressograph* was based

> "on grounds of public policy . . . that in a decree, at least in one entered in by consent, either an adjudication of infringement, or a grant of some relief from which infringement may be inferred, is essential before any effect of res judicata can be given to it on the issue of validity."[21]

Since *Lear*, several courts have recognized that a consent decree adjudicating patent validity alone is not res judicata.[22] There are substantial reasons for refusing to grant such decrees res judicata

effect. An invalid patent cannot be infringed; conversely, only a valid patent can be infringed. In the words of the Supreme Court: "To hold a patent valid if it is not infringed is to decide a hypothetical case."[23] When sued by the owner of a patent, a defendant's principal concern is to resist a finding of infringement; that a patent is declared valid is of little consequence to him as against his interest in warding off a finding of infringement which may cast him in substantial liability. This was the underlying rationale of our Court of Appeals in *Addressograph* in concluding that a consent decree which merely declared validity was not entitled to estoppel force, whereas one that also included an adjudication of infringement would be given res judicata effect on the validity issue.[24]

Plaintiff urges that despite the adjudication of infringement in the consent decree entered in the prior action, *Lear's* public interest concept requires that its doctrine be extended to apply to such decrees—in effect that *Addressograph* is no longer good law. Two Courts of Appeals have considered this issue, but neither made a definitive ruling. Our own Court of Appeals, invited to overrule *Addressograph*, declined to do so since plaintiff sought no declaration of inva-

---

19. Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 665–66, 64 S.Ct. 268, 88 L.Ed. 376 (1944).

20. 156 F.2d 483 (2d Cir. 1946).

21. *Id.*, at 485.

22. Crane v. Aeroquip Corp., 504 F.2d 1086, 1092 (7th Cir. 1974); Kraly v. National Distillers and Chem. Corp., 502 F.2d 1366, 1368 (7th Cir. 1974); Broadview Chem. Corp. v. Loctite Corp., 474 F.2d 1391, 1395 (2d Cir. 1973); Business Forms Finishing Service, Inc. v. Carson, 452 F.2d 70, 75 (7th Cir. 1971). *Contra*, Schlegel Mfg. Co. v. King Aluminum Corp., 369 F.Supp. 650 (S. D.Ohio 1973). *Cf.* Massillon-Cleveland-Akron Sign Co. v. Golden State Adv't Co., 444 F.2d 425 (9th Cir.), cert. denied, 402 U.S. 873, 92 S.Ct. 100, 30 L.Ed.2d 117 (1971) (covenant in settlement agreement not to contest patent's validity void and unenforceable as against public policy.)

23. Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450 (1943). *As a matter of logic, as a number of courts have observed, it should follow that "to hold a patent invalid if not infringed is also to decide a hypothetical case."* Addressograph-Multigraph Corp. v. Cooper, 156 F.2d 483, 485 (2d Cir. 1946); Hale v. General Motors Corp., 147 F.2d 383, 388 (1st Cir. 1945). Even so, invalidity has been adjudicated in the absence of infringement because, in the apt words of Chief Judge Learned Hand, the invalid patent "should not remain in the art as a scarecrow." Bresnick v. United States Vitamin Corp., 139 F.2d 239, 242 (2d Cir. 1943); *see also* Cover v. Schwartz, 133 F.2d 541, 545 (2d Cir. 1942), cert. denied, 319 U.S. 748, 63 S. Ct. 1158, 87 L.Ed. 1703 (1943).

24. Addressograph-Multigraph Corp. v. Cooper, 156 F.2d 483, 484–85 (2d Cir. 1946).

lidity and defendant made no charge of infringement. The court stated: "In light of the record before us which fails to establish any pleading or proof of invalidity, we see no warrant here to extend *Lear* or to overrule *Addressograph*."[25] The Seventh Circuit Court of Appeals, in dictum, seemingly favors extending *Lear* to apply to all consent decrees. In Kraly v. National Distillers and Chemical Corporation,[26] where an infringement action was dismissed with prejudice but there was no adjudication of infringement, the court hypothesized as follows:

> "Even if we assume, however, that the consent decree embodied an adjudication of infringement, we do not believe that the *Lear* rationale would necessarily be inapplicable."[27]

With due deference to the *Kraly* court,[28] such a holding is undesirable.

It is important to emphasize the precise thrust of *Lear*. It abolished the doctrine of estoppel to permit a licensee to challenge the validity of the patent in a suit for royalties due under the contract, recognizing that usually licensees are the only parties with enough economic incentive to do so. The position here urged by plaintiff is not needed to enable a licensee to attack a patent's validity. It is one thing to say that a party is not prevented from contesting the validity of a patent merely by entering into a licensing agreement. It is quite another to allow one, freed of the barrier of licensee estoppel, to commence litigation with a full opportunity for a trial on the issues of validity and infringement, to consent to an adverse adjudica-

tion on both issues and then for him cavalierly to ignore the consequences of the decree based on such consent the minute he leaves the courthouse. The decree under that theory is merely a scrap of paper.

■ In this court's view, a balancing of the relevant public interest factors requires that consent decrees containing adjudications of validity and infringement, entered into without collusion, after the litigants have had the opportunity for pretrial discovery and a trial on the merits, be accorded res judicata effect. Such decrees should be of no less binding force than a judgment of validity and infringement entered after a trial on the merits. To hold otherwise would permit abuse of the judicial process, waste of judicial resources and reward questionable ethical conduct. These are all matters which also concern the public interest. To adopt the plaintiff's position would force every patent validity and infringement suit to a trial on the merits to assure a res judicata effect. It would discourage settlement of such litigation, since otherwise there could be no assurance of finality. Must this assurance come only as a result of a trial on the merits so that litigation is compelled to achieve an unassailable position? The public interest is not served by driving a patentee and an alleged infringer into extended litigation of a kind recognized by the Supreme Court as "a very costly process," entailing "staggering" financial burdens upon the respective litigants where, even in a nonjury trial, "an inordinate amount of trial time"[29] is required.

**25.** Broadview Chem. Corp. v. Loctite Corp., 474 F.2d 1391, 1395 (2d Cir. 1973).

**26.** 502 F.2d 1366 (7th Cir. 1974).

**27.** *Id.* at 1369.

**28.** Relying on the *Kraly* decision, the court in USM Corp. v. Standard Pressed Steel Co., 184 U.S.P.Q. 476 (N.D.Ill.1974) held that a consent decree finding patent validity and infringement would not be given res judicata effect.

**29.** Blonder-Tongue v. University Foundation, 402 U.S. 313, 334, 337, 91 S.Ct. 1434, 1447, 28 L.Ed.2d 788 (1971). *See* Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948):

> "The general rule of *res judicata* applies to repetitious suits involving the same cause of action. It rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations."

To plaintiff's contention that it should again be permitted to challenge the validity of the patent in the public interest, the short answer is that it had that opportunity in its first declaratory judgment action wherein it consented to the decree it now seeks to void. Either it then failed to serve the public interest when it abandoned its attack on the validity of the patent or, perhaps satisfied it was valid, served its own economic interest. Having derived the benefits of a settlement and a license agreement, plaintiff should not now, upon a claim that it is the defender of the public interest, be permitted to disavow its commitments.

■ The public policy against monopolies is not without its limits, as two Seventh Circuit cases demonstrate. In Ransburg Electro-Coating Corp. v. Spiller and Spiller, Inc.,[30] the court enforced a settlement agreement to pay money for past infringement even though after the settlement agreement was entered into, a different Court of Appeals held that the subject of the settlement did not infringe. The court recognized that enforcement of the settlement contract would result in the payment of damages partly for the use of a device that is outside the scope of the patent. While *Lear* concluded that federal patent policy requires the abolition of the doctrine of licensee estoppel, the court held "that such policy must occupy a subsidiary position to the fundamental policy favoring the expedient and orderly settlement of disputes and the fostering of judicial economy."[31] Similarly, in Maxon Premix Burner Co. v. Eclipse Fuel Eng. Co.,[32] the court noted that while public policy encourages tests of patent validity, public policy also favors conservation of judicial time and limitations on expensive litigation.[33] Therefore, the court held that a party had waived the right to contest the validity of a patent by raising the issue for the first time in post trial motions after the court had found infringement.

The Ninth Circuit, in Schnitger v. Canoga Electronics Corp.,[34] held that a trial on the merits is not required before a judgment of patent validity and infringement is entitled to res judicata effect. The court's per curiam decision does not so indicate, but an examination by this court of the record in *Schnitger* reveals that the prior judgment accorded res judicata effect was obtained by default. The holding in the instant case follows a fortiorari.[35]

■ To permit plaintiff to reassert in this suit the same claims it advanced in its first action is tantamount to relegating all consent decrees in patent suits of this kind to the status of a voluntary dismissal without prejudice under Rule 41(a) of the Federal Rules of Civil Procedure, with the end result as if the action had not been brought in the first place.[36] At least in the instance of a voluntary dismissal the court may impose terms as a condition thereof to prevent abuse of the judicial process.[37] Under plaintiff's theory, it could immediately upon the entry of the consent decree commence a second litigation, free

---

30. 489 F.2d 974 (7th Cir. 1973).

31. 489 F.2d at 978.

32. 471 F.2d 308 (7th Cir. 1972), cert. denied, 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 591 (1973).

33. 471 F.2d at 312.

34. 462 F.2d 628 (9th Cir. 1972).

35. Record on Appeal at 18.

36. Humphreys v. United States, 272 F.2d 411, 412 (9th Cir. 1949) ; A. B. Dick Co. v. Marr, 197 F.2d 498, 502 (2d Cir.), cert. denied, 344 U.S. 878, 73 S.Ct. 169, 97 L.Ed. 680 (1952) ; 9 C. Wright & A. Miller, Federal Practice and Procedure § 2367 (1971).

37. Harvey Aluminum, Inc. v. American Cyanamid Co., 15 F.R.D. 14, 18 (S.D.N.Y. 1953).

of any conditions or costs and engage the time and attention of heavily over-burdened courts.

If consent decrees of validity and infringement could so readily be disregarded by an alleged infringer, there is less incentive on his part to challenge the patent when the issue of infringement first arises in a litigation—the logical time to do so if the public interest is to be promptly served. Adopting the plaintiff's position may postpone the time when invalid patents are successfully challenged, to the detriment of the public interest.[38]

Finally, if consent decrees entered into by litigants free from collusion do not have res judicata effect, then courts are called upon to perform an idle ceremony. Giving the stamp of approval to a meaningless document can only breed disrespect for the sanctity of a judicial decree. If that is the end result, such decrees should not be signed by the courts.

Accordingly, the consent decree entered in the prior action between the parties is to be accorded res judicata effect with respect to the adjudication of (1) the validity of the patent, and (2) infringement of the patent by plaintiff's product Meta-Tef 530.

## II

As to plaintiff's further motion for summary judgment under its second cause of action, the foregoing disposition does not foreclose plaintiff from asserting non-infringement of defendant's patent by other products manufactured by it, which products were not the subject of the prior consent decree. Since there are disputed issues, the motion is denied.

---

38. Ransburg Electro-Coating Corp. v. Spiller and Spiller, Inc., 489 F.2d 974, 978 (7th Cir. 1973).